ASCENSION MARTINEZ *alias* CHON MARTINEZ V. THE STATE.

No. 20163. Delivered May 17, 1939.
Rehearing Denied May 22, 1940.
Request for Leave to File Second Motion for Rehearing Denied (Without Written Opinion)
June 12, 1940.
Order Staying Issuance of Mandate June 21, 1940.
Order Staying Mandate Set Aside and Mandate Ordered Issued October 23, 1940.

The opinion states the case.

*Ramon L. Longoria,* of McAllen, and *Kennedy Smith,* of Raymondville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

This is the second appeal of this case, the opinion in the

first case being found in 134 Texas Crim. Rep., 180, 114 S. W. (2d) 874. In each instance the penalty was death.

In the latter part of December, 1934, the decomposed body of a man was found stranded in the Rio Grande River, with a cover for a Model T. Ford transmission case tied to the body by means of a rope. This man's name was not known, but the body evidenced a death by violence, as shown by bruises and fractures of the skull, as well as numerous wounds on the body. There were certain tattoo marks over the body which, together with his height, weight and other characteristics, finally made up the allegations in the indictment relative to his identification, which was never made more definite. Appellant was not apprehended for about two years thereafter, it appearing from the record that he had changed his residence from this State to Mexico, and was undoubtedly a fugitive.

Upon the trial of this case it was shown that this deceased person and a woman, presumptively his wife, were temporarily present in a house belonging to a woman named Teresa Chapa, and were last seen alive by this Chapa woman, when one Placido Handy came to her home and took this man and woman away with him in a car. These unknown persons seemed to be desirous of crossing out into Mexico, and, as shown by the testimony, Placido Handy, together with five others of Mexican extraction, one of whom was appellant, had previously entered into a conspiracy for the purpose of robbing and killing this man and woman, and disposing of their bodies. The conspiracy was carried out, if the testimony is to be believed, in a most brutal manner. The woman was raped nine times, despite her pleas to be killed rather than to be thus treated. The man was beaten, shot, cut and stabbed; the woman, after she had satisfied the lust of these conspirators, was killed by them by beating, shooting and cutting her, and both bodies, weighted with pieces of an old automobile engine, were thrown into the Rio Grande River. Some six weeks thereafter the man's body was found lodged in the river with its weight still attached, but so far as this record shows the river still keeps its secret as to where the woman's unsepulchred body lies.

The record is voluminous and contains many bills of exception that evidence great diligence and labor on the part of appellant's attorneys in their presentation of this case in both the trial court and this court. The questions presented can be finally relegated, however, to practically a few propositions, which we will proceed to discuss.

The first proposition relates to a change of venue, which

was asked in a motion properly filed, and at a hearing thereof a large amount of testimony was adduced. This motion was by the trial court overruled, and his action thereon is brought before us for review in bill of exceptions No. 1, which occupies a major portion of the transcript. This bill of exceptions and the testimony adduced thereunder is identical with bill of exceptions No. 1 in the case of Placido Handy, our number 20298, opinion handed down on April 19, 1939, (139 Texas Crim. Rep., page 3) the same testimony being offered in that case and this instant one. We wrote at length in that case and endeavored to analyze this testimony in a synopsis form, to which opinion we here refer.

It seems in this case that eighty-nine prospective jurors were interrogated, thirty-one of whom were excused because of having formed an opinion; the State used eleven of its peremptory challenges, and the appellant exhausted all of his challenges and was by the court allowed two extra challenges, which were exercised. It seems from the record that no talesmen were required, the jury being finally selected from the original venire. We see no good reason for further going into the matters complained of in this bill, and, in the interest of brevity, we refer the interested reader to what we said, relative to the motion for a change of venue, in the companion case of Handy v. State, No. 20298, (139 Texas Crim. Rep., page 3) for our views in this matter, and on the strength of that case as authority we overrule this bill of exceptions No. 1.

Bill of exceptions No. 2 presents the following question for our review: The court in its charge to the jury properly embodied therein a fair and legal charge relative to a confession purportedly made by appellant wherein he implicated himself in this homicide, and which to a large degree was corroborative of the testimony given by one Jose Rodriguez, a self-confessed accomplice, who testified fully relative to these gruesome details. There was an objection leveled by appellant's attorneys at such charge, and in place thereof appellant requested the giving of the following charge: "You are instructed as a part of the law of this case, that there has been admitted in evidence a written statement made by the defendant while under arrest and in the custody of officers. In this connection you are instructed that unless you find and believe from the evidence, beyond a reasonable doubt, that the written statement was made by the defendant of his own free will and accord, without any force, threats or coercion on the part of anyone, and not as a result of any fear of bodily harm, and unless you further find and believe from the

evidence, beyond a reasonable doubt, that before such statement was made, the defendant was warned by the officers before whom such statement was made that he did not have to make any statement at all, and that any statement made by him may be used in evidence against him on the trial of the offense with which he stands charged, then you must acquit the defendant and say by your verdict 'not guilty.' "

The basic difference between such paragraphs in the court's charge being the fact that the court charged the jury that unless they believed that such confession was freely and voluntarily made, under no persuasion nor promises, and after a proper warning, then they should disregard same, and went no further therein. However appellant's requested charge went further, and, had same been given, it would have directed the jury, in the event that they found such confession to have been improperly made by appellant, that they should acquit him, and say by their verdict not guilty. This element of an acquittal was based upon the proposition, as alleged by appellant's attorneys, that there was no corroborative testimony of any kind or character in this case as to the self-confessed accomplice's statement except the confession of appellant, and if the same was not considered by the jury under the court's instruction relative thereto, then appellant was entitled to an acquittal, because there was no corroboration of the accomplice's testimony.

We confess this proposition has caused us some concern. Our attention has been called to the case of Ball v. State, 39 S. W. (2d) 619, wherein it appears that this court held, in substance, the doctrine laid down by appellant in this bill of exceptions; and that is where a confession has been introduced in evidence, which confession was claimed to have been involuntarily made, and the question relative thereto has been submitted to the jury, and there being no further corroboration than the confession of the testimony of an evident accomplice, the court should instruct the jury to acquit, in the event they found the confession to have been improperly obtained. We find that such a proposition has also been laid down in Melton v. State, 77 S. W. (2d) 243. We do not think, under the circumstances of this case, that such is a sound proposition of law. In the first place, we notice that the court correctly instructed the jury upon the law of accompliceship; that the witness Joe Rodriguez was an accomplice, and that it was necessary not only that his testimony be believed to be true, and that it showed appellant's guilt, but also that there should be other and further testimony tending to connect the appellant with the commission of the offense, and

unless they thus found, that they could not convict the defendant, and that finally they should acquit the appellant unless they believed him guilty beyond a reasonable doubt. The court also charged that they should discard the purported confession of appellant, and not use the same for any purpose, unless they believed same to have been voluntarily made without coercion of any kind, and not even then unless they found other separate and independent evidence outside of and independent of such statement corroborative thereof in some material matter tending to connect the defendant with the killing, if any, and under the facts and charges thus given, unless the contrary be shown, we think it may be presumed that the jury obeyed the court's instructions therein.

We are further impressed with the thought that the court should not have singled out this one special thing and framed his charge thereon to the effect that a failure to consider one portion of the testimony should result in a verdict of acquittal upon the jury's part. Such an instruction, we think, would have been upon the weight of the testimony. Suppose the testimony relied upon as a corroboration of the accomplice had been given by the witness A. B. Would the court have been justified in instructing the jury that unless they believed the witness A. B., they should acquit the appellant. Carrying the illustration still further, suppose corroborating testimony was given by both A. B. and C. D. Would not the court be called upon to instruct the jury that they must acquit the defendant unless they believed the testimony of both A. B. and C. D.? The illustration could be carried on ad infinitum, or at least until the court would find itself in the position of classifying all the testimony, and under the duty of instructing the jury on not only the weight of the testimony, but also its effect,—in regard to each proposition presented.

We have recently been confronted with a similar situation relative to the doctrine of circumstantial evidence, under the proposition that no case falls under the doctrine of circumstantial evidence where there is any direct evidence relative to the accused's guilt. We have held in late cases that where a confession of the accused is submitted to the jury relative to whether or not same was voluntarily made, with the instruction to use the same only in the event they find same to have been made free from coercion, etc., that it was not necessary to further instruct the jury on the law of circumstantial evidence in the event that the jury should decide that such confession was improperly obtained.

We have heretofore said in Wilkins v. State, 115 S. W. (2d) 907, that: "Although it was made an issue as to whether appellant's confession was voluntary and such issue was submitted to the jury, it was not necessary to charge on circumstantial evidence. See Wilson v. State, 103 Tex. Cr. R. 403, 281 S. W. 844; Langhorn v. State, 105 Tex. Cr. R. 470, 289 S. W. 57; Simmons v. State, 107 Tex. Cr. R. 504, 296 S. W. 513; Dyer v. State, 105 Tex. Cr. R. 374, 288 S. W. 230; Snow v. State, 106 Tex. Cr. R. 222, 291 S. W. 558; Johnson v. State, 82 Tex. Cr. R. 82, 197 S. W. 995."

We quote from Wilson v. State, supra: "The trial court correctly refused appellant's special charge No. 2, wherein he sought to have the jury told that they should not consider the confession unless they believed its statements to be true, and that, if they found same to be untrue, the case would be one of circumstantial evidence. There was no warrant for said charge either in fact or law, and for this court to so hold would engraft on our practice the singling out in any case of the direct testimony on which the State relied, and telling the jury in the charge that if they did not believe this direct testimony to be true, then the case would be one of circumstantial evidence. The unsoundness of such doctrine needs no discussion."

We quote from the case of Langhorn v. State, 105 Texas Crim. Rep. 477: "Appellant sought also by his special charge No. 2 to have the jury told that if they considered appellant insane, and because of that fact they did not consider the confession introduced by the State, then the case was one of circumstantial evidence. The instruction was properly refused. If the jury believed the appellant insane he should have been acquitted, and the charge so informed them."

In the present case the court instructed the jury that if there be no corroboration of the accomplice's testimony, then they should acquit the defendant. The court also instructed the jury that they could not convict the defendant on his confession, even though they believed the same to have been voluntarily given, and to be free from coercion, etc., unless there was also separate and independent evidence, outside of the confession, corroborating samein some material matter tending to connect the defendant with the killing of the deceased. The latter portion of such charge was more favorable to the accused than he was entitled to. See Simmons v. State, 107 Texas Crim. Rep. 507, 296 S. W. Rep. 513; Lawson v. State, 96 Texas Crim. Rep. 322; Dyer v. State, 96 Texas Crim. Rep. 301; Gandy v.

State, 99 Texas Crim. Rep. 643; Aven v. State, 95 Texas Crim. Rep. 155.

We quote from the opinion on motion for rehearing in the Johnson case, 82 Texas Crim. Rep. 85: "Appellant now contends that the court, in connection with the charge given, submitting to the jury whether or not they could consider the confession of appellant, proven up and introduced in evidence, should have charged on circumstantial testimony in the event the jury should disregard and not consider the confession. * * * In our opinion the case did not require a charge on circumstantial evidence."

It occurs to us that the same reasoning that sustains the proposition that where the State relies solely upon a confession in order to take the case out of the domain of one of circumstantial evidence, and the voluntariness of such confession is submitted to the jury for their decision, that nevertheless it is not the duty of the trial court to charge the jury in the event they disregard the confession, that such a case then becomes one of circumstantial evidence,—if such a charge is an improper one under such facts, our reasoning ought to necessarily follow that if a confession is relied upon to take a case out of the realm of a conviction upon the uncorroborated testimony of an accomplice, that it should not be proper nor necessary to anticipate the contingency of the jury disregarding such confession, and instructing them that if they so disregard such testimony, then that there was no corroboration of such accomplice, and they should acquit the defendant. If such an instruction be given, why should not the defendant also be entitled to a charge of like import wherein the sole eye witness, who had been vigorously impeached, why should not the court tell the jury that if you do not believe the testimony of this eye witness, then you should acquit the defendant on account of the only further testimony being that of an admitted accomplice. We think the analogy with the above quoted cases and the instant proposition with which we are confronted is close enough to say that they should be decisive of this question, and that the court should not have singled out this one question and instructed the jury that in the event they disregarded the confession of appellant, that they should acquit him. They were instructed that before they could convict appellant they should not only believe the testimony of the accomplice, and that same showed the guilt of the appellant, and that there was further and other testimony corroborative of the accomplice's testimony, tending to connect him with the commission of the offense, and

such corroboration would not be sufficient if it merely showed the commission of the offense. Evidently the jury understood this instruction, and surely knew what was meant by the word "corroboration," and knew that if they had no other testimony than the appellant's confession with which to corroborate the accomplice, and they disregard that, then the inevitable result would have been an acquittal, and we have no reason to say otherwise than that they obeyed this instruction of the court. We are impressed with the conviction that the court went as far as the law justified him in going when he gave the jury these instructions and left the application of their findings to their conscience and sound discretion. To have gone further would soon lead us into the doctrine of special issues and a finding thereon, as is now provided in civil causes.

As to the proposition laid down herein, that it is not the duty of the court to single out certain portions of the facts and charge thereon in connection with the probable finding of the jury on other facts submitted to them, we quote from Hines v. State, 40 Texas Crim. Rep. 27: "* * * Among other things, it was shown that the defendant had a watch that was shown to have been in the possession of Henry Meyer at the time of the killing. This is the watch in regard to which appellant contends the court should have charged the jury. The contention seems to be that if the identification of defendant as the slayer of deceased was not sufficiently proved by Gotlieb Meyer, or otherwise than by the watch, the court should have instructed the jury 'that it was not alone sufficient to connect him with the crime charged in the matter aforesaid.' This theory of defendant is based upon the supposition that this was the only evidence in the case that tended to connect him with the murder, if the testimony of Gotlieb Meyer was discredited by the jury. This, in our opinion, would have afforded no reason for the court to have singled out this particular fact, to the exclusion of the other facts in the case, upon the question of identification. He was not only identified by Gotlieb Meyer as being the man, but there are quite a number of other facts and circumstances in the case that tend strongly to identify appellant as the perpetrator of this homicide. We know of no rule that would require the court to single out each of the different facts that tend to identify or connect a party with a crime, and charge upon each separately. If the court were required to charge the jury with reference to the watch, the rule would have been equally as strong with reference to the testimony of Jim Jackson as to the possession of the cap subsequent to the murder, which appellant had prior to the murder obtained from Willis Dow; and also

as to the fact that his discarded shirt was found a few hundred yards distant from where the homicide occurred; as well as other circumstances in the case which tended to connect him with this offense."

That this court is correct that where a confession is introduced and presented to the jury for determination as to its voluntariness, and it is the only direct testimony presented, nevertheless the case rests not on circumstantial evidence, and should not be thus charged, is held in 24 Texas Jurisprudence, p. 590, as follows: "* * * nor is a charge as to circumstantial evidence necessary where the defendant's participation in the crime is shown by the testimony of an accomplice, or by an unequivocal admission or confession of the accused. To relieve the court of the necessity of giving a charge of this character the confession or admission should unequivocally admit the commission of the act charged, but it need not do so in the exact language of the statute defining the crime. A claim that inculpatory statements were made through fear does not alter the rule that admissions or confessions of guilt obviate the necessity of a charge on circumstantial evidence."

While we have endeavored to reason from analogy in the cases above quoted, we now resort to the instant case, and bill of exceptions No. 2. In order to render proper the requested charge, it is necessary that there be no corroborative testimony at all as to any material fact testified to by the accomplice. To the application of this proposition we are not in full accord so far as these facts are concerned. We find from the testimony that in a short time after the disappearance of the deceased person and his wife, that the appellant disposed of his automobile and fled to Mexico, where he remained for a period of practically two years, as testified to by the immigration officers, who said they were looking for him, and when he did appear in Texas he himself was armed with a fully loaded pistol, and was in company with another who was similarly armed. That this testimony was admissible is justified, we think, by the following quotation from 18 Tex. Jur., p. 41, as follows: "The flight or attempted flight of a person after the commission of a crime, while not of itself sufficient to raise a presumption of guilt, is a circumstance which is to be considered by the jury in connection with all the other facts and circumstances in the case as tending in some degree to prove a consciousness of guilt. * * *

"In proving the flight of the accused it is competent to show that soon after the crime he left the county or the state, and that a letter written by him showed that he was a fugitive. It

is also relevant to show the efforts made to locate or apprehend the accused, his pursuit and capture, including his resistance to arrest when overtaken, even though this may amount to the commission of another crime."

Appellant's bill of exceptions No. 3 relates to the testimony of Charlie Wallis, a senior patrol inspector, wherein he testified that for approximately two years, while in the discharge of his duties, he was looking for the appellant, endeavoring to catch him on the Texas side of the river, and that he did not arrest any of the co-conspirators during such time; that witness and other officers were laying for appellant in order to catch him on the north side of the Rio Grande, but did not find him for two years. That the flight of the accused was permissible to be proven we have just shown by the above quotation from 18 Texas Jurisprudence, p. 41. The portion of the above testimony relative to the failure to immediately arrest the other co-conspirators seems to have been brought out by appellant's attorneys on cross-examination, according to the trial court's qualification to such bill. This bill does not impress us as evidencing any error.

Bill No. 4 complains of the court allowing the officers who finally arrested appellant to testify that appellant, as well as his companion at such time, were armed with fully loaded pistols, which were taken off their person at such time. We again refer to 18 Tex. Jur., p. 43, wherein it is said: "It is also relevant to show the efforts made to locate or apprehend the accused, his pursuit and capture, including his resistance to arrest when overtaken even though this may amount to the commission of another crime." See Williams v. State, 90 Texas Crim. 619, 236 S. W. 984; Thompson v. State, 90 Texas Crim. Rep. 15, 234 S. W. 401; Taylor v. State, 49 Texas Crim. Rep. 10. This bill also complains of a subsequent action of the trial court in allowing the introduction of a pistol in evidence, which the arresting officers identified as the one taken off the person of appellant at the time he was arrested. And subsequently while the appellant was on the stand, and after he had admitted that on the night of his arrest he and a companion illegally crossed the boundary river from Mexico to Texas, he was asked by the State's attorney if he was not armed with this gun, exhibiting the one just above referred to, which question was objected to, and exception reserved, and the possession of such gun was denied by appellant. Subsequently the witness Wallis was recalled as well as his companion, in the arrest of appellant, W. C. Greer, and both affirmed the fact that this identical pistol was

taken off appellant's person at the time of his arrest, at which time the appellant's attorney moved to exclude such testimony from the consideration of the jury, which the court refused to do, and exception reserved. Again subsequently during the closing argument to the jury by the district attorney he is shown in said bill to have said: "coming back from across that river in the dead of night with a companion armed, this man armed with that weapon," (brandishing said Exhibit No. 8), which argument was objected to, the objection overruled, and exception noted. It is apparent that this bill is multifarious and presents many different propositions, taking place throughout the whole trial of this case, but on account of the severity of the punishment we have considered the same. Brought down to its last analysis, this bill is based upon the proposition that the possession of this pistol by appellant is a separate and distinct offense, and the admission of the same was prejudicial and inflammatory.

The authorities above cited hold that when the flight of the accused has been shown, it is relevant to show his pursuit and capture, including his resistance when overtaken, although such may amount to the commission of another crime. It should surely follow that his preparation for such a resistance in thus arming himself, and surrounding himself with armed companions, would be a matter that was relevant and material to the issue of guilt and a consciousness thereof.

Bill of exceptions No. 5 relates to the fact that the trial court allowed proof, over appellant's objection, of the fact that at the time of appellant's apprehension by the officers he was accompanied by one Gil Casares, who was also engaged in an illegal crossing into Texas at nighttime, and was armed with a fully loaded pistol. What we have said previously in regard to bill No. 4 applies to this bill also. We are of the opinion that the circumstances surrounding appellant's arrest after his flight and seclusion in Mexico for about two years are material and relevant to the question of his guilt herein.

Bill of exceptions No. 6 seems to be based on an objection to the cross-examination of a witness relative to the fact that he had not testified theretofore in this case. We do not see any merit in the objections leveled at such questions, and we overrule this exception, and to the same effect is bill No. 7, and our ruling is the same.

Bill of exceptions No. 8 complains of the fact that while appellant was on the stand he was asked if he crossed the bridge (over the river) or came slinking across the river at nighttime

in a boat in an illegal crossing with a companion, and, over appellant's attorney's objection, he answered that he passed illegally that night, the objection to such a question being that it tended to show the defendant guilty of a crime other than the one with which he was charged. What we have said relative to bill No. 4 is also applicable in this matter, and controls us in overruling this exception.

Our final conclusion herein is that the case of Ball v. State, 39 S. W. (2d) 619, and followed by Melton v. State, 77 S. W. (2d) 243,—wherein this court held that where a confession is relied upon as corroboration of the testimony of an accomplice, and such confession was claimed to have been improperly obtained, and the question of its use by the jury has been submitted to the jury, then in such event the court should instruct the jury that in the event they find such confession to have been improperly obtained, that they should acquit the defendant,— lays down an incorrect doctrine, and we now hold that such a doctrine is an instruction upon the weight of the testimony, and also is a singling out of a phase of the case and a charging directly on testimony that was offered relative to the whole case and for all purposes. So believing, the two cases mentioned above are hereby overruled. These two cases seem to be ones of first impression; they are not supported by any decisions of this State, or of any other state, so far as we can find. They do not come under any analogous reasoning that has been called to our attention, but, if followed to their natural conclusion, they would result in various instructions that would necessarily bear upon the weight of certain testimony submitted to the jury for their determination, and a specific instruction would have to be given for each separate possible finding of the jury on such submitted proposition. We are impressed with the idea that under the doctrine of a corroboration of the accomplice's testimony the matter could be safely submitted to the jury, and upon their finding of guilt, we have the right to say that, in accord with the State's testimony, they found the confession properly made, and utilized the same as corroborative of the accomplice. We also see no reason why we could not say that had they found no corroboration of such accomplice, then that they would have followed the court's instructions and acquitted appellant.

We think this case was properly and legally tried, and that the record presents no error.

The judgment is therefore affirmed.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

The first point urged in appellant's motion for rehearing is that bill of exception number four reflects error in permitting proof to be made by the officers who arrested appellant on the night of October 11, 1936, that appellant was at the time of his arrest armed with a double-action 45 Colt's pistol fully loaded, the objection to such evidence being that it tended to show appellant was guilty of another crime other than the one for which he was on trial, and that the pistol which appellant had was not shown to be the instrument with which the offense being tried was committed.

Appellant seems to view the evidence complained of as the proof of an independent crime, apparently overlooking what to us appears to be the necessarily related facts that appellant soon after the murder for which he was on trial fled to Mexico, and there remained as a continuous fugitive up to the date of his apprehension. The facts last mentioned, we think, differentiate the present case from those cited by appellant in support of his contention. In the Lawrence case, 128 Tex. Cr. R. 417, 82 S. W. (2d) 647, no such condition existed as is here present. There it was sought to prove certain acts of the accused entirely independent of the one for which he was on trial, thus forming the basis for an argument that if he had committed the others, therefore, he had also committed the present one. Likewise, in Watson v. State, 88 Tex. Cr. R. 227, 225 S. W. 753, and Riggins v. State, 42 Tex. Cr. R. 472, 60 S. W. 877, there was no question of flight or appellant being a fugitive from the United States. Appellant also cites Locke's case, 129 Tex. Cr. R. 432, 88 S. W. (2d) 110; Reed's case, 123 Tex. Cr. R. 452, 59 S. W. (2d) 377; and Hancock v. State, 123 Tex. Cr. R. 154, 58 S. W. 129; Stanchel v. State, 89 Tex. Cr. R. 358, 231 S. W. 120, as supporting his position. In none of them does the question of flight, or being a fugitive appear. They all present instances where proof of other offenses than the one on trial was thought by this court to have been improper.

Appended to bill of exception number four is an explanation by the trial court setting out the facts before him upon which he made the ruling complained of in said bill, and stating his reasons for admitting the testimony sought by appellant to be excluded. We quote from such statement the following:

"Upon the trial of this case one Charlie Wallis, a Senior Patrol Inspector of the United States Immigration Service, was called

as a witness for the State and testified in substance that he assisted in the capture of the defendant, near midnight, on the night of October 11, 1936, approximately two years after the date of the alleged offense for which defendant was on trial, and that the capture occurred in a remote and isolated section of Hidalgo County, Texas, on that portion of the Military Road south of Donna, Texas, in said County, and near the Rio Grande River, and near the scene of the alleged murder, and that at the time of said capture the defendant was in company, among others, with his brother, Amiliano Martinez and one Braulio Yanez, both of whom are co-defendants in this cause and under indictment, and that at said time the defendant was armed with a 45 double action Colt Pistol, which was loaded with six shells, and that said defendant was also in company at said time with a companion by the name of Gil Casares, who was also armed with a 38 double action pistol, which was loaded with six shells, and that at said time both guns were ready to be fired.

"The witness Wallis further testified that he had known the defendant for several years prior to the murder and that the defendant had resided all of that time near the scene of the murder, and that the defendant was an American citizen having been born in the United States, which fact was later admitted by the defendant when he took the witness stand, and that a very few days after the body of the deceased was found the defendant immediately crossed the river and went to Mexico, where he remained practically all the time until the night of his arrest. Other testimony disclosed that shortly after the body of the deceased was found, the defendant transferred his automobile to one Placido Handy, a co-defendant in this case, also under indictment, and said defendant thereupon went to Mexico, where he remained until he was arrested.

"The witness Wallis further testified that he and other officers attempted to arrest the defendant in connection with this case at about the time he went to Mexico, or shortly thereafterwards, and that they often laid in wait for said defndant down near the banks of the Rio Grande River near the defendant's residence and the scene of the crime, on information that he was crossing in the dead of the night to pay visits to relatives on the American side, but they were unable to apprehend and capture him until the night of his capture, as above stated.

"Testimony from Wallis and other officers, as well as from the defendant himself, who voluntarily took the stand in this case, disclosed that the defendant, in company with the above named Gil Casares, illegally crossed the Rio Grande River from a spot in Mexico directly in front of the home of one Felipe Hernan-

dez, a co-defendant in this case and under indictment for this same transaction, to the American side, at a spot near the scene of the crime in this case and close to the residence of this defendant and the residence of this defendant's relatives; that the crossing was made in the dead of the night, near midnight, and was not over a bridge at any port of entry between Mexico and the United States but was an illegal crossing made by the defendant and his companion, Gil Casares, in a row boat, and that the defendant was apprehended shortly after he made such illegal crossing, at a place and under the circumstances above set out. The witness Wallis further testified that although he and other officers had been trying to apprehend and capture said defendant for a period of nearly two years, this was the first opportunity they had to seize him.

"As heretofore stated, the defendant voluntarily took the stand as a witness on his own behalf, placed thereon by his counsel, and readily admitted that he and his companion, Gil Casares, were making an illegal crossing in the dead of the night from the Mexican side of the river to a place on the American side of the river near his home, and that the said Gil Casares was armed with a loaded pistol, yet the defendant positively denied that he himself had a loaded pistol or a pistol of any kind, and he denied that the officers found a pistol upon his person when he was captured.

"It was the State's theory of this case that shortly after the body of the deceased was discovered in the waters of the Rio Grande River near the scene of the crime, the defendant, although shown to have been an American citizen, born in the United States and living practically all of his life near the scene of the crime, on the American side of the river, fled into Mexico in order to escape arrest for this particular crime, and that the officers attempted to arrest him shortly afterwards but were unable to arrest him for a period of almost two years; until the night of his actual arrest and capture; that at the time of the defendant's capture and arrest he was still attempting to evade and prevent arrest for this particular crime, and was returning to the American side, surreptitiously, to pay a hurried visit to his relatives, with an illegal crossing, of said river, and that the fact he and his companion, Gil Casares, who crossed the river with him, were armed with loaded pistols ready to be fired was a material fact and had a material bearing upon whether or not he, the said defendant, had fled and had escaped arrest for this particular crime shortly after the body of the deceased was found, and whether or not he, the said defendant,

was a fugitive from justice from this county for this particular crime, as contended by the State, which theory and facts were disputed by the defendant. The Court allowed said pistol to be introduced in evidence by the State to substantiate the State's theory of flight on the part of the defendant and the fact that the defendant had remained in Mexico, as a· fugitive from justice of this county for this particular crime, for a period of almost two years, or almost immediately after the discovery of the body of the deceased, and to substantiate the State's theory that at the very time of the defendant's arrest, which was the first opportunity the officers had to arrest him, he was still attempting to evade arrest for· this particular crime, and was prepared, by carrying said weapon fully loaded in his person, to resist arrest; on this theory the Court considered such evidence material evidence for the State's case, * * *"

The matters stated in the foregoing explanation are borne out by the record.

The State may prove the flight of accused and the pertinent attendant circumstances, and may also show that accused resisted arrest or threatened to resist arrest. Branch's Ann. Tex. P. C., Sec. 135; Mitchell v. State, 52 Tex. Cr. R. 39, 106 S. W. 124; Moreno v. State, 160 S. W. 361. In Walker v. State, 74 Tex. Cr. R. 645, 169 S. W. 1156, it was held admissible for the State to prove that accused made threats to resist any effort to arrest him. In the present case the record shows no resistance or attempted resistance of appellant when he was arrested, or whether the arrest was effected under circumstances which would render futile any effort at resistance. Notwithstanding this, under the circumstances certified by the trial court in explanation of the bill in question, we feel unwarranted in holding that error was committed by the court in admitting proof of the fact that appellant was armed when arrested.

In Hunter v. State, 59 Tex. C. R. 439, accused was in jail charged with murder. He escaped from jail. The sheriff effected his re-arrest on the third day after his escape. The sheriff testified over accused's objection that when accused was re-arrested: —"* * * that he had a 32-automatic pistol and a Colt's and Winchester, that he had plenty of cartridges, including about a box and a half of 32's and about seventy-five 44's; that the automatic pistol was a weapon that shot eight times, and that to fire same all you had to do was to pull the trigger and it would not stop after it got started unless you threw it in a tub of water." In passing upon the objection Judge Ramsey, writing for the court, said: "There was little or no occasion, we think,

to have shown in detail the character of arms that he had, though it would have been competent, we think, to have shown that his escape was under such circumstances and with such arms as implied and indicated an effort to defy arrest, but we are not prepared to hold especially under the facts of this case, that the introduction of these matters could, in the nature of things, seriously have injured appellant, or that they are sufficient to justify a reversal of the judgment of conviction."

As throwing some light on the question discussed we refer to Wallace v. State, 93 Tex. Cr. R. 590, 249 S. W. 480; Wynne v. State, 56 Ga. Rep. 113; State v. Shaw, 73 Vt. 149; Johnson v. State, 120 Ga. 135; Campos v. State, 50 Tex. Cr. R. 102; Cabrera v. State, 56 Tex. Cr. R. 141, 118 S. W. 1054; State v. Lambert, 104 Me. 394; Am. & Eng. Ann. Cases, Vol. 15, p. 1055, and especially reference is made to the notes thereunder on "Admissibility of Evidence that Accused was armed when Arrested." The same subject finds treatment in 20 American Jurisprudence, p. 272, Sec. 291.

The second point urged by appellant in his motion for rehearing is that we erred in not holding that bill of exception number five presented error. The bill complains at the reception of evidence from officer Wallis that when appellant was arrested his companion, Gil Casares was armed with a pistol. We observe that at page 199 of the statement of facts appellant himself, while denying that he had a pistol at the time of his arrest, testified without objection that Casares had one, saying "because he (Casares) has been an officer there all of the time." The bill in question may be disposed of on the general proposition so frequently announced that when evidence complained of goes into the record from another source without objection no error is presented. See 4 Tex. Jur. p. 586, Sec. 414; Hudson v. State, 107 Tex. Cr. R. 330, 296 S. W. 573; West v. State, 116 Tex. Cr. R. 468, 34 S. W. (2d) 253; Pence v. State, 110 Tex. Cr. R. 378, 9 S. W. (2d) 348; Wagner v. State, 53 Tex. Cr. R. 306, 109 S. W. 169, and cases therein cited; McLaughlin v. State, 109 Tex. Cr. R. 307, 4 S. W. (2d) 54.

The third point in appellant's motion questions the action of the court in overruling a motion for change of venue. The record on that point is precisely the same as found in Cause No. 20,298, Handy v. State, reported in (139 Texas Crim. Rep. 3); 138 S. W. (2d) 541. The record on the issue mentioned was closely scrutinized as is evidenced by the opinion in Handy's case. The question was re-examined upon motion for rehearing

in said case and the trial court's action in declining to order a change of venue was sustained. Upon the same record here appellant's contention is overruled.

Appellant has filed a supplemental motion for rehearing urging that the confession of appellant was obtained in violation of the "due process" clause of the Constitution of the United States and comes within the rule announced by the Supreme Court of the United States in Chambers, et al v. The State of Florida, decided February 12, 1940, 60 Sup. Ct. Rep. 472.

Said supplemental motion might be stricken from the record because filed so late, but because of the death penalty having been assessed we prefer to deal with the question on its merits. This court is in harmony with the holding in the Chambers case (supra) as evidenced by the opinions of this court in Blackshear v. State, 130 Tex. Cr. R. 557, 95 S. W. (2d) 960; Abston v. State, 132 Tex. Cr. R. 130, 102 S. W. (2d) 428; Abston v. State, 136 Tex. Cr. R. 152, 123 S. W. (2d) 902, which opinions were written long before the Chambers case was decided. See also Sigler v. State, No. 20,915, decided April 24th, 1940, not yet reported. (139 Texas Crim. Rep. 167.)

The point now urged was not presented on original submission, but since the filing of the supplemental motion we have been at some pains to examine the entire record as it relates to appellant's present insistence. It is suggested in the motion that the officers obtained three confessions from appellant and that it was not until the third one that its contents were satisfactory to the officers. We think the record fairly construed does not support such a conclusion. Only one confession was used and nothing was said about any other until it was developed by appellant himself on his direct examination. He testified that the first confession related to the killing by himself and some of his co-defendants in the present case of a man named "Conrado" at a point somewhere on the Rio Grande River. This confession was given sometime either Sunday night or Monday morning. If the officers had any information of the killing of "Conrado" up to the time appellant told them about it the record is silent. The conclusion might be drawn that appellant's statements were not in accord with other information which the officers had—if they had any at said time about the killing they were investigating. On Monday appellant was taken to the river by some of the officers where he pointed out a place where "Conrado" was killed. Appellant was then taken back to the jail in Edinburg. Later he made a second statement about still another

killing in which he and some of his co-defendants were involved. The name of the party killed on the occasion to which the second statement relates was not known, but it had reference to some transaction in which "morphine" figured, and after they obtained the morphine some one called "The Brush" by appellant went to sell it. Neither of these two statements had reference to a killing where a man and a woman were involved. On Wednesday or Thursday appellant made the confession regarding the killing of the unknown man and woman involved in the present case. Appellant admitted on cross examination that the two prior statements made by him were about other killings than the one for which he was then on trial. Unless we misapprehend the record the foregoing statement fairly explains how three statements became involved in the case,—put into it by appellant's own evidence.

Appellant tells a story about his claimed treatment by the officers which induced him to make the several confessions which, if true, would put to shame the cruelties of the Spanish Inquisition. He attributes most of the claimed punishment was inflicted upon him by one Ingram, a deputy sheriff. Appellant claimed that Ingram tightened up the hand-cuffs until it was painful, hit him on the head and shoulders with a chain attached to the cuffs; suspended his body with the hand-cuff links over the top of a door and with his toes barely touching the floor; hit him with a blackjack, cursed him, calling him a liar and a s-- of a b---. Appellant asserted that Ingram practically put the words of the confession in appellant's mouth and that he told what was in the confession because he was directed what to say and that he made and signed the statement "so they wouldn't hit me any more." Appellant claimed that Uncle Billy Brewster was present when appellant was being subjected to the treatment described.

It is not amiss to here state that Jose Rodriguez, one of the participants in the killing of the man and woman and the violation of the woman against her entreaties, testified upon the trial detailing the horrible incidents of the murder of the man and woman, and ravishment of the latter by appellant and his confederates. The confession of appellant corroborates to the minutest detail the evidence given by Rodriguez. To our minds the confession itself refutes appellant's claim that the statements in the confession were put in his mouth by Ingram or anyone else. The horrible details, it appears to us, could be related only by one present and participating in the crime. Ingram specifically denies all acts of cruelty or punishment and

cursing and abusing attributed to him by appellant. He further testified that Brewster did most of the talking to appellant. Uncle Billie Brewster, was 67 years old, and had been deputy sheriff for 35 years, and had known appellant for fourteen or fifteen years. He spoke Spanish as well as he spoke English. We quote from his testimony as follows:

"I recall when this defendant was arrested and I first saw him in the jail in Weslaco, when I went down there with Mr. George Ingram and we talked to this defendant down there, but no one went down with George and me, although Manuel Munoz was with us afterwards. When we first went there to the jail to talk to this defendant, I did most of the talking and I talked to him some there by myself, but neither I nor George nor any one else down there beat or abused or mistreated this defendant in any way, and George Ingram did not hit him with a black-jack or a billy club or hit him with chains in his face and neither did anybody else. After talking with this defendant down there, we came on up to Edinburg with him and talked to him here in Edinburg, and I, myself, did most of the talking to him, but neither George nor I, nor anybody else beat or abused or mistreated Chon Martinez in any way up here and I never saw anybody beat or abuse him, and if anybody is close to Chon it would have been me, and I would not have permitted anybody to have beaten him and if anybody has been with Chon it has been me, except when I have been sick, as, except when I have been sick, I have been around him every day and I have never seen any blood on him at any time. I was in there practically all of the time that Chon made this statement to Mr. Hartley and Mr. Chapa, walking in and out, and I remember when he made the third statement about this particular case here, and he told that story to me before it was taken down in writing and then Chapa was called and it was taken down and signed, and I did not use any force of any kind to get that statement and no force was used at the time that he made the statement to Chapa or at any time, since this defendant has been arrested."

In addition to Ingram and Brewster the State called as witnesses in rebuttal of appellant's testimony as to the treatment he claimed to have received, Charlie Wallis, W. C. Greer, Tom L. Hartley, S. B. Bledsoe, C. D. Carnahan, Lee Pettit, Dick Gilliam, Elmer Vickers, J. M. Chapa, A. G. McHenry, Fred J. Meyer, R. T. Daniel and Ben Brooks, Jr. It will be remembered appellant claimed that during all the time he was giving the statements and during the time he was being questioned by the officers about the several statements made by him he was being

abused, cursed and punished by Ingram, and being told by Ingram what statements to make. Unless appellant's evidence is to be received and believed in preference to the several witnesses above named appellant's testimony was far from the truth. Certainly the trial court and the jury were justified in rejecting his evidence and accepting that of the other witnesses on the issue joined between the State and appellant regarding the confession.

We doubt if in all the annals of crime in Texas or elsewhere there has been a more diabolical offense than the one reflected by the record before us. That very fact has impelled us to again examine the questions presented by appellant in his motion for rehearing, and to write at length thereon, being jealous that appellant be deprived of no rights to which he is entitled under the Constitution and laws of this state or the United States.

Believing that nothing is presented which calls for a disposition of the case different from that originally ordered, the motion for rehearing is overruled.

### ORDER STAYING MANDATE.

HAWKINS, Presiding Judge.

The Clerk of the Court of Criminal Appeals of Texas will stay the issuance of mandate in the above entitled and numbered cause until the appellant has opportunity to present an application for writ of certiorari to the Supreme Court of the United States, and in the event such writ should be granted, to further stay the issuance of mandate until the Supreme Court of the United States shall have determined the case.

This the 21st day of June, 1940.

### ORDER.

HAWKINS, Presiding Judge.

The judgment of conviction in this cause became final on the 22d day of May, 1940, when appellant's motion for rehearing was overruled. Thereafter on the 21st day of June, 1940, upon application of appellant's attorneys the clerk was directed to stay the issuance of the mandate to give appellant opportunity to take such steps as he deemed necessary to have the case reviewed by the Supreme Court of the United States.

It is now made known to the court upon motion of the State that since such stay order no effective effort has been made

182

to seek such a review and that no request therefor is pending before the Supreme Court of the United States. By reason of these facts the order of the court staying the issuance of the mandate should be set aside and the mandate of this court should at once issue.

In reply to the State's motion attorney for appellant suggests that the reason efforts were suspended to have the judgment of this court reviewed by the Supreme Court of the United States was because of the refusal of appellant to sign the necessary papers. Counsel suggests that in his opinion the reason appellant so refused was because he had become insane since the trial. If the issue of present insanity should be raised this court has no jurisdiction to determine the question, but it must be determined by the trial court after its jurisdiction has been restored, which will occur upon receipt of the mandate of this court. Therefore, a further suspension of the issuance of the mandate is not deemed proper.

The court now directs that the order heretofore made on the 21st day of June, 1940, staying issuance of the mandate be set aside, and the clerk of this court is ordered to issue mandate instanter.